MABEL F. ISQUITH, Appellant, v. JOHN H. ISQUITH and Another, Respondents. (Action No. 1.)

MABEL F. ISQUITH, Appellant, v. JOHN H. ISQUITH and Another, Respondents. (Action No. 2.)

Second Department, May 22, 1930.

*Alvah W. Burlingame,* for the appellant.

*Clarence G. Bachrach* [*Ira Wollison, Herman S. Bachrach* and *Samuel S. Bisgyer* with him on the brief], for the respondents.

KAPPER, J. Defendant John H. Isquith and plaintiff are husband and wife. She brought two actions against him and impleaded the defendant corporation, the first of the two suits affecting property on Clinton avenue, Brooklyn, and the second affecting property on South Elliott place, Brooklyn. In the first-mentioned suit she claimed that in equity she was the one-half owner of the Clinton avenue property, and that her husband procured her execution of a deed to the corporation through fraud and deceit and by abuse of plaintiff's trust and confidence in him.

In the second suit she made like charges against her husband, he being the owner in fee and she being induced to convey her dower interest to the defendant corporation. The judgment demanded in the first action is that the plaintiff be decreed the owner of an undivided one-half of the property, that the deed to the corporation be canceled of record, and that the defendant husband deliver a deed to plaintiff of such one-half interest. In the second action the relief demanded, in effect, is the restoration to plaintiff of her inchoate right of dower in the property.

The defendant husband is a physician. He was married to

plaintiff by a so-called civil ceremony on October 1, 1926, and religiously on October 17, 1926. Their engagement of marriage dated from June, 1926, the plaintiff at that time being twenty-two years of age. Shortly before the marriage, the plaintiff's father and his prospective son-in-law discussed the purchase of the Clinton avenue property which was wanted as the home of the young couple and as a physician's office for the husband. Plaintiff and her father, together with the individual defendant, inspected these premises, but the price, $20,000, was something which Dr. Isquith (defendant) regarded as more than he could afford, in view of the fact that necessary alterations to adapt the property to the proposed uses would approximately amount to a like sum. Plaintiff's father then told the doctor that he would contribute one-half of the purchase price " as a wedding gift to Mabel " (plaintiff), it being suggested that the doctor need not contribute cash for his half but could obtain a purchase-money mortgage therefor. A later conversation took place between the father and the doctor as to how the title to the property was to be taken, this being on the heels of the civil ceremony. The father inquired whether the doctor was going to take title " in Mabel's name, or in both of your names? " The testimony of the father then proceeds: " ' Well,' he said, ' in order to give a prestige to my old parents, you know how they are, they are old people, I would rather take it in my name. So afterwards,' he said, ' it does not make much difference, then I will transfer the whole thing to Mabel, or part. It does not make any difference to me.' I said, ' Well, if Mabel is satisfied, I am satisfied. It doesn't make any difference. You are married just the same. It is half and half.' So we let it go at that. Q. Did you thereupon give Dr. Isquith a check? A. Well, that was about a day before the closing. I went to the bank and had a certified check for him."

The father's check for $10,000, with the indorsement of the doctor, is in the record. The trial justice found: " 9. That the sum of Ten Thousand ($10,000) Dollars received by the defendant Isquith from the plaintiff's father Joseph Friedland, was used by him in the purchase of the premises aforesaid."

The plaintiff testified that after she and the doctor had expressed their liking for the property, she first heard from the doctor and her father of her father's gift to her of one-half of the purchase price, her father telling her that he and her mother were giving her " this gift." Title to this property was taken on either the 6th or 7th of October, 1926. The plaintiff was present at the title closing and her husband asked her " whether the house should be taken in my name or in his," to which she replied that it made but little

difference as the property belonged "to both of us," adding, "I have a half interest in it, and you have." The deed was thereupon made in his name as grantee.

In the summer of the year following the marriage, the husband and his brother had a conversation with plaintiff, and the husband represented that he wanted to collect a bill from a patient, to do which he would have to bring a lawsuit and feared that his patient would .counterclaim for malpractice, and "he wanted to protect him and protect me from attachments or liens in case of a countersuit." The doctor's brother then suggested the advisability of forming a corporation to take the title to the house as well as the property owned individually by the husband. The defendant corportion was accordingly formed, and all of its stock, excepting a few shares to qualify directors, was issued to the husband. Upon plaintiff being apprised of the purpose to incorporate she expressed her satisfaction upon the understanding that she was to have an equal interest in the corporation with her husband, whereupon, and on the following morning, he asked her to go with him to a notary. What happened at the notary's was the signing of the two deeds, but the plaintiff asserted that she neither knowingly nor intentionally signed deeds, but believed and understood, in the light of the representations of her husband and his brother, that she was signing papers for the purpose of incorporating the defendant corporation.

The notary testified that he was a long-time friend of the husband, and while he claims to have asked both husband and wife whether they knew what they were signing, adding also that the husband told him the papers were deeds and the wife using the same words declared "They are deeds," he admitted that because of his long friendship with the doctor he "perhaps did not even ask him," i. e., whether he knew what he was signing.

A deposition of the husband's brother was read in evidence, and he claimed to have been present at the signing of the deeds by the plaintiff and her husband, and that she acknowledged the papers as "deeds." The notary, although knowing this brother very well, had no recollection of his being present at the time. The plaintiff not only denied the notary's claim that he told her she was signing deeds, but also denied that her husband's brother was present.

In the latter part of 1927 the husband decided to terminate his matrimonial relations, and brought an action to annul his marriage upon the ground of fraud, that action being commenced on December 10, 1927. This was not long after the alleged execution of the deeds by the plaintiff which were dated September 12, 1927.

The trial court found that the plaintiff knowingly executed, acknowledged and delivered a deed of the Clinton avenue property

to the defendant corporation, and also knowingly released her inchoate right of dower in the South Elliott place property by joinder with her husband in the deed to the corporation.

The defendant husband was not at the trial, and at its outset, in answer to the inquiry of plaintiff's counsel whether the husband was in court as his presence was desired, the husband's counsel stated that he was not in court and that " if he has obeyed my instructions, he will not be here." The matters in dispute were peculiarly within the knowledge of the defendant husband, and as was said in *Dowling* v. *Hastings* (211 N. Y. 199, 202), " Why did he not go on the witness stand and explain the transaction? " The principle announced by Judge ANDREWS in *Wylde* v. *Northern R. R. Co. of N. J.* (53 N. Y. 156) was reiterated in the case cited — that where one party to an action, knowing the truth of a matter in controversy and having the evidence in his possession, omits to speak, every inference warranted by the evidence will be indulged in against him, the court adding: " That rule applies with full force in this case." The rule should be applied with like force in the present case; and, in that aspect, the finding that the plaintiff knowingly signed deeds when she had it represented to her that she was signing papers for the purpose of incorporating the defendant corporation is against the weight of the credible evidence. The trial court further found: " 5. That at or about the time of the said marriage the plaintiff's father, Joseph Friedland, gave to the defendant John H. Isquith the sum of Ten Thousand ($10,000) Dollars as and for a wedding present or gift." The next finding was as follows: " 6. That said gift by said plaintiff's father to said defendant was absolute and unconditioned, and that there was no contract or agreement of any kind made between the plaintiff's father and the said defendant Isquith as to the disposition to be made of said moneys."

The all-sufficient answer to the last two quoted findings is that they are wholly without evidence to support them. The evidence is distinctly to the effect that the father's check for $10,000, besides his contribution of $5,000 towards alterations made on the house, was a gift to his daughter to vest her with a one-half ownership in the property. That the sum of $10,000 advanced by the father was used by the defendant husband in the purchase of the premises is without dispute and was, as stated, found by the trial court to be the fact.

The position of the defendants is that there was no fraud upon which the plaintiff can predicate a cause of action; that the Statute of Frauds (Real Prop. Law, §§ 242, 259) is a defense to her claim of an interest in the property; and that section 94 of the Real

Property Law, which provides that a grant of real property for a valuable consideration, to one person, the consideration being paid by another, vests the title in the grantee and that no use or trust results to the person paying the consideration or in his favor, stands in the way of a recovery.

The defendants say that where a claim for the recovery of property is made by one alleging to have been deprived thereof through fraud, all of the cases have as a basis the actual ownership by the party complaining and from whom the improper title was fraudulently obtained. In other words, the contention is made that, in all of the cases where a trust is held to result because of some fraud on the part of the grantee, the plaintiff who parted with the property was the owner thereof, and that as the plaintiff here never had legal title, she is remediless in equity to fasten the badge of fraud upon the transaction. I do not regard this contention as sound, and as a matter of fact there are cases to the contrary. In *Siemon* v. *Schurck* (29 N. Y. 598) a parent purchased lands for the benefit of and as an advancement to his child, but the conveyance was made to a third person by deed, absolute in form. It was held that a resulting trust in favor of the child existed at common law, and that the provisions of the Revised Statutes (1 R. S. § 51) did not embrace such a case. (This section of the Revised Statutes was in substance the same as section 94 of the Real Property Law.)

In *Wittner* v. *Burr Avenue Development Corporation* (222 App. Div. 285) the plaintiff sued to impress a trust in her favor as to a one-half interest in real property and alleged that she and one of the individual defendants purchased the property, each contributing one-half of the purchase price. The title was taken in the name of the individual defendant. Thereafter, another individual defendant, acting as plaintiff's attorney with intent to defraud plaintiff, induced her to convey her one-half interest in said premises to the defendant corporation, a domestic corporation organized by the individual defendants. It was held that the defense of the Statute of Frauds was not available to the defendants, for, on the basis of the allegations in the complaint, it not only did not constitute a defense but the courts will not permit the Statute of Frauds to be used to perpetrate a fraud. It was there said (p. 287): " The plaintiff has alleged a cause of action not only wherein she paid one-half of the consideration for the property, but what is more important in the consideration of this question, where the defendant received the property upon a trust as to one-half of the same for the benefit of the plaintiff. Whether the reason relied on in the particular authority is that the contract is sufficiently performed to take the same without the Statute of Frauds, or that the courts

will not permit the Statute of Frauds to be used as a shield to defraud, certain it is that the courts will not permit either a legal or an equitable interest in property to be obtained by a defendant through fraud, and the recovery of this property by the person defrauded to be prevented by an assertion of the Statute of Frauds."

We see in the last case cited that the plaintiff never owned the property, but contributed to its purchase upon an agreement that she would be a one-half owner therein.

The cases are too numerous for citation here which hold the statute not to be a defense to an action to recover an interest in property obtained by fraud. It suffices to quote on this proposition the recent case of *McKenna* v. *Meehan* (248 N. Y. 206, 214), where the court say: " If the Statute of Frauds had been pleaded, the question would still remain whether there had been such an abuse of a confidential relation as to lead without a writing to the implication of a trust. [*Sinclair* v. *Purdy*, 235 N. Y. 245.] Equity gives relief on the ground of the perpetration of fraud independently of the Statute of Frauds. If such relief is granted, the legal estate remains in the grantee but equity holds her to the performance of her verbal agreement. A constructive trust is declared to hold and sell which fastens itself on the property. In cases of established fraud, where the conveyance is not set aside and the trust is not executed automatically by the provisions of the statute, equity will suffer the title to rest in the fraudulent grantee as trustee *ex maleficio* to execute the trust in accordance with its terms. (*Wood* v. *Rabe*, 96 N. Y. 414, 422.) "

In connection with the defense of the Statute of Frauds, it should be pointed out as an undisputed feature in this case, the representation of the husband as an inducing cause to carry out the transaction, and the likelihood of his being subjected to a judgment which might, in view of his being the titular holder of the whole property, imperil plaintiff's rights and interests therein. This, in the light of the defendant's willful absence from the trial, must be regarded as a scheme concocted by him to deprive his wife of her half interest in the property as well as her dower interest in the property on South Elliott place of which he was the owner.

If we were to assume that the learned trial justice was warranted in finding that the plaintiff knowingly signed deeds, one to convey any interest she might have in the Clinton avenue property to the corporation, and the other a relinquishment of her dower rights to the South Elliott place property, the position of the defendants is not bettered. The rights asserted by the plaintiff are not against creditors but against her husband and his corporation. She naturally trusted him and was willing to follow his suggestion that

her interests be made immune from the claims of creditors of the husband, of whom, as stated, there were none, or at least none were proven.

The language of the late Presiding Justice KELLY of this court (then Associate Justice) in *Tiedemann* v. *Tiedemann* (201 App. Div. 614, 617) is peculiarly applicable. He said: " But my brethren who dissent think that the plaintiff cannot have relief in equity because he made the deed to his wife for the purpose of hindering, delaying and defrauding his creditors. (See *Simis* v. *Simis*, 146 App. Div. 655; *Lynch* v. *Jones*, 179 id. 613.) It seems to me the answer to this is that there is no evidence that the plaintiff had any creditors at the time he made the deed to his wife, or at any time, nor is there evidence that by making the deed in question he divested himself of all his property. On the evidence in the case he was still entirely solvent. He had his contracting business and plant and it is evident that he was in funds because he continued to improve the property and to expend money on it. Apparently the railroad company acknowledged its responsibility for the accident in which the boy was killed who was riding on plaintiff's truck. There is no suggestion that the boy's parents ever made claim that plaintiff was responsible for the occurrence or that he owed any money to the next of kin of the deceased boy. It is suggested that as the next of kin of the boy were potential creditors, they might have presented a claim, and that Tiedemann had this in mind when he made the deed and that he intended to remove the property from the lien of any judgment which might be recovered. But I think this is going too far. Tiedemann never conceded that he was responsible for the accident. On the contrary, he preferred a claim against the railroad company and collected damages. If he feared a lawsuit I see no justification on the evidence for the inference that he was endeavoring to defraud any one. There is no evidence of any debt .or liability on his part, and the objections of my dissenting brethren are based on the inference that there was a debt, and secondly on the inference that if there was a debt he was endeavoring to avoid it. None of the decided cases go to this extreme. If there are in fact debts and obligations and the debtor divests himself of property to avoid payment, it may be that he cannot recover it in equity, but that is not this case. In the countless cases where a man takes title to his home in his wife's name, or transfers the home to his wife so that she may have shelter for herself and children, if we go into the mental operations of the husband and father we may find that the transfer was made to protect the family against the vicissitudes of business operations and the like, but I have never

understood that such transfers were barred by the law or by considerations of conscience and fair dealing."

If we were to go a step farther than the case last cited and indulge in the assumption that the wife was a willing party to the transaction, always bearing in mind that it was upon the husband's representation that he purposed evading an impending creditor's claim of the existence of which there was not the slightest proof, the authorities do not estop her from avoiding the transaction.

In *Ford* v. *Harrington* (16 N. Y. 285) a lawyer obtained a transfer of property from his client upon the former's advice that that was the way in which to protect the property from the creditors of the client. It was said (p. 293): " I think this is a case where, on account of the relations existing between the parties and the circumstances under which the contract was assigned, the court was called upon to interfere and compel the attorney to restore what he had acquired under the assignment, on being repaid what he had disbursed, although the object of the assignment was to perpetrate a fraud. The parties, although *in delicto*, did not stand *in pari delicto*."

Similarly, the case of *Freelove* v. *Cole* (41 Barb. 318; affd., 41 N. Y. 619) was one in which a son-in-law of the plaintiffs, who were husband and wife, persuaded them to convey a farm to him to avoid their creditors, which was done upon his promise to reconvey it after the claims of the creditors had been paid. A reconveyance was directed to be made.

And *Place* v. *Hayward* (117 N. Y. 487) was likewise determined upon a like state of facts.

In *Boyd* v. *De La Montagnie* (73 N. Y. 498) a husband represented to his wife that she was liable for a debt and on the strength of that representation induced her to convey her property to him so as to save it. It was held that the burden was on the husband to show that the receipt of the gift was a fair and proper transaction, and the wife was held entitled to recover. CHURCH, Ch. J., writing for the court, said (p. 503): " Nor is it an answer that the wife consented to the transaction to defraud creditors. The parties do not stand on equal terms, and the husband cannot avail himself of the plea of *particeps criminis* on the part of the wife. (*Freelove* v. *Cole*, 41 Barbour, 318; affirmed, 41 N. Y. 619; *Osborne* v. *Williams*, 18 Vesey, 379.) But assuming what I think is the real fact, that the defendant believed that his statement that the wife was liable for the claims against the Gold Hunter was true, it follows that the parties acted under a mutual mistake, and even if it be regarded a mistake in law, it is one, I apprehend, which courts of equity will relieve against, especially between parties thus situated.

(Story's Eq., § 138.) And if we go a step farther in favor of the defendant's good faith (and the evidence justifies it), and assume that he supposed the transfer was really made from motives of love and affection, yet, if the wife, though entertaining a sufficient affectionate regard for him to have made the transfer, was, in fact, induced to do it under the supposition of the liability, and would not have done it otherwise, and this belief was produced by the untrue statements of the defendant, although he may have believed them true, within the principles above referred to, I think she is entitled to relief."

It seems to me that a confidential relation between the plaintiff and the defendant husband was the procuring cause of the transactions which the actions seek to annul. It was "the case of a confidence induced, not by the bare promise of another, but by the promise and the confidential relation conjoined." (*Wood* v. *Rabe*, 96 N. Y. 414, 426.) Under many authorities the rule in this State is settled that equity will grant relief under the facts here disclosed. "It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion." (See *Sinclair* v. *Purdy*, 235 N. Y. 245, 253.)

The defendants' brief tells us: "The defendant Isquith was closely connected with the defendant Trebro Holding Corporation when the property was conveyed to that corporation, and the defense has throughout conceded that if fraud was practiced by John Isquith the defendant Trebro Holding Corporation would have to be chargeable with notice thereof. The defense proceeds on the contention that no fraud was practiced." There is no controversy as to the relations of the defendants, one to the other. The defendant corporation is to be charged, therefore, with holding, in trust, the plaintiff's interests in the property in question.

In my opinion the judgment should be reversed upon the law and the facts, with costs, and judgment directed for the plaintiff for the relief demanded in the complaints in both actions, with costs of the trial, and that findings of fact and conclusions of law inconsistent herewith should be reversed and new findings and appropriate conclusions of law made accordingly.

LAZANSKY, P. J., RICH, HAGARTY and SCUDDER, JJ., concur.

Judgment reversed upon the law and the facts, with costs, and judgment directed for the plaintiff for the relief demanded in the complaints in both actions, with costs of the trial. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and appropriate conclusions of law will be made. Settle order on notice.